**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DARNELL M. GOINGS, | |
| Plaintiff, | |
| v. | Civil Action No. 11-501 (BAH) |
| | Judge Beryl A. Howell |
| COURT SERVICES AND OFFENDER SUPERVISION AGENCY FOR THE DISTRICT OF COLUMBIA, | |
| Defendant. | |

### MEMORANDUM OPINION

In this case, plaintiff Darnell Goings challenges the constitutionality of sex offender conditions imposed upon him by the Court Services and Offender Supervision Agency for the District of Columbia (hereinafter "CSOSA"), a federal agency charged with overseeing his five-year probation term. In 2010, the plaintiff was convicted, on his plea of guilty, in a Florida state court of sexual battery for having sex with a 16-year-old female state prison inmate in 1995 while he worked at the prison as a corrections officer. He was sentenced to incarceration for less than one year, followed by five years' probation. After completing his jail sentence, the plaintiff, a District of Columbia resident, was transferred under the Interstate Compact for Adult Offender Supervision to the District of Columbia, where he was placed under the authority of CSOSA. CSOSA then unilaterally imposed seventeen special probation conditions upon him, including, among other things, banning the plaintiff from any contact with his children.

On March 9, 2011, the plaintiff filed the instant lawsuit arguing that six of the conditions of his probation were imposed upon him in violation of the Due Process Clause of the Fifth

Amendment. The plaintiff simultaneously filed a motion for a preliminary injunction, seeking to enjoin CSOSA from enforcing the challenged conditions until a ruling on the merits of the plaintiff's claim. ECF No. 2.

After reviewing the plaintiff's briefs in support of his motion for a preliminary injunction, the defendant's opposition papers, as well as the accompanying declarations and the applicable law, and following oral argument, the Court grants in part and denies in part plaintiff's motion for a preliminary injunction. For the reasons set forth below, the Court enjoins CSOSA from enforcing Special Condition 15, banning the plaintiff from having unsupervised contact with minors, only in so far as it applies to the plaintiff's children, but denies the plaintiff's request to enjoin enforcement of the remaining conditions.[1]

## I. BACKGROUND

In 1995, when he was twenty-three years old, the plaintiff worked as a corrections officer at the Franklin County Jail in Florida. Compl. ¶ 27. While employed at the prison, the plaintiff had consensual sex with a sixteen-year old female inmate. *Id.*; Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Aprille Cole Decl. (hereinafter "Cole Decl."), ¶ 13. When prison officials became aware of the inmate's pregnancy and the plaintiff's relationship with the inmate, the plaintiff was fired from his job, but not charged with a crime or arrested at that time. Compl. ¶ 28.

Several months after the plaintiff was fired, the plaintiff moved in January 1996 from Florida to the District of Columbia, where he had grown up and had a family. *Id.* at ¶¶ 27-28. Two months after he moved, on March 8, 1996, prosecutors in Franklin County, Florida charged the plaintiff with sexual battery by a person in a position of custodial authority for having sex

---

[1] Given the sensitivity of the information discussed, this opinion is to be filed under seal for a period not to exceed seven days. The parties are directed, as specified in the Order accompanying this Memorandum Opinion, to request redaction of private information before this Memorandum Opinion is publicly released.

with the 16-year old inmate, and a warrant was issued for his arrest. *Id.* at ¶ 29. The plaintiff

states that he was not aware of this warrant, and the record contains no evidence that the plaintiff

attempted to evade arrest. *Id.* at ¶ 30. [2]

From January 1996 to November 2009, the plaintiff lived in the District of Columbia,

where he fathered three children and, according to the plaintiff, "spent that time raising a

family." *Id*. at ¶ 31. The plaintiff entered into a long-term relationship with Anika Davis, with

whom he is now engaged to be married, and helped raise his eleven-year old son, D.G.; his three-

year old son, J.G.; and his two-year old daughter, A.G. Pl.'s Mot. Prelim. Inj., ECF No. 2,

Darnell Goings Decl. (hereinafter "Goings Decl."), ¶¶ 2-4. During this time, the plaintiff was

employed at Reagan National Airport and Walter Reed Hospital, and states that he "was active in

the community as a football coach and PTA member." Compl. ¶ 31.

Between 1996 and 2009, the plaintiff was named as a respondent in two separate

domestic disputes. Cole Decl., ¶ 18. Specifically, in 2002, the plaintiff was charged with simple

assault after he slapped his then-girlfriend, who is the mother of one of his children. *Id.* at ¶¶ 18,

21; Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 10, Dennis Ramos and Celina Gates,

Center for Clinical and Forensic Services, Inc., Risk Assessment/Intake Report for Darnell M.

Goings, Mar. 14, 2011 (hereinafter "Def.'s Treatment Provider Report"), at 4. This charge was

dropped, however, when the plaintiff agreed to enter anger management. Cole Decl., ¶ 18; Def.'s

Treatment Provider Report, at 4. In 2006, the plaintiff's current fiancée, and the mother of two of

his children, Anika Davis, filed for a temporary restraining order and civil protection order after

---

[2] The defendant suggests that the plaintiff "managed to evade his Florida arrest warrant for several years by leaving the state of Florida during the pendency of an investigation into his conduct," Def.'s Opp'n Mem., at 36, but conceded at oral argument that no evidence supports this suggestion. Mot. Hearing, Goings v. CSOSA, No. 11-cv-501 (April 15, 2011). On the contrary, the record indicates that the plaintiff went to the police to seek assistance in 2008, an action that is not consistent with a person seeking to evade an outstanding arrest warrant. Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 7, District of Columbia Superior Court Petition and Affidavit for Civil Protection Order filed by Darnell Goings against Cheryl Henderson (2008).

the plaintiff displayed threatening behavior towards her. Cole Decl., ¶ 21; Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 4, District of Columbia Superior Court Petition and Affidavit for Civil Protective Order filed by Anika Davis, Nov. 27, 2006. Despite this incident involving the plaintiff's current fiancée, Ms. Davis asserts that the plaintiff "is a loving, dedicated, and compassionate father." Compl., Ex. 2, Anika Davis Decl. (hereinafter "Davis Decl."), ¶ 3.

On November 20, 2009, thirteen years and ten months after the plaintiff left Florida, a D.C. Metropolitan Police officer conducted a background check on the plaintiff and discovered the outstanding 1996 warrant for the plaintiff's arrest. Compl., ¶ 32. The plaintiff was subsequently arrested and transported to Florida on the criminal arrest warrant. *Id.* at ¶ 33. The criminal investigation revealed that the plaintiff had sexual relations with two prison inmates, one of whom also served as a "look-out" for the plaintiff while he had sex with the sixteen-year old victim of the offense of conviction. Cole Decl., ¶ 13.

On June 17, 2010, the plaintiff pled no contest to one count of sexual battery by a person in a position of custodial authority. Compl., ¶ 33. At his plea hearing, the victim testified that her relationship with the plaintiff was consensual and that the plaintiff should receive no jail time. *Id.* at ¶ 34. On August 27, 2010, Franklin County Circuit Court Judge James C. Hankinson sentenced the plaintiff to eleven months and twenty-nine days of jail time, with credit for 277 days of time served, and five-years' probation. *Id.* at ¶ 35. Judge Hankinson also ordered that the plaintiff register as a sex offender, as required by Florida law, but specifically instructed that no sex offender conditions be placed upon him. *Id.* at ¶¶ 35-36; Compl., Ex. 5, Franklin Cnty., Florida Circuit Court, Court Minutes Disposition, Aug. 27, 2010.

**A.  Transfer to the District of Columbia and to CSOSA**

Toward the conclusion of the plaintiff's jail term, the plaintiff requested that he be allowed to serve his five-year probation sentence in the District of Columbia, and his Florida probation officer arranged for his transfer through the Interstate Compact for Adult Offender Supervision ("ICAOS"). Compl. ¶ 37; Cole Decl. at ¶ 14; Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 5, Darnell M. Goings, Offender's Application for Interstate Compact Transfer, Sept. 21, 2010.

ICAOS is a formal agreement between member states and the District of Columbia that "seeks to promote public safety by systematically controlling the interstate movement of certain adult offenders." Def.'s Opp'n Pl.'s Mot. Prelim. Inj, ECF No. 10, Ex. 11, Interstate Commission for Adult Offender Supervision: ICAOS Rules (hereinafter "ICAOS Rules"), at *1.  Under this "little-known" compact, states may transfer offenders to other states, where the receiving state then administers the offender's sentence. *M.F. v. State of New York Exec. Dep't. Div. of Parole*, No. 10-2074, 2011 WL 1345460, at *1 (2d Cir. Apr. 11, 2011); ICAOS Rules, at *1. ICAOS provides that the state receiving an out-of-state offender "supervise an offender transferred under the interstate compact in a manner determined by the receiving state and consistent with the supervision of other similar offenders sentenced in the receiving state."  ICAOS Rules, Rule 4.101.  Additionally, "the compact administrator or supervising authority in the receiving state" is authorized to impose special conditions on an out-of-state offender "if that special condition would have been imposed on the offender if sentence had been imposed in the receiving state." ICAOS Rules, Rule 4.103.

When the plaintiff requested a transfer to the District of Columbia through ICAOS, he signed an application in which he agreed to abide by the terms and conditions of the supervision

imposed upon him in the District of Columbia and recognized, if transfer were authorized, that

he would be "subject to the rules of the Interstate Commission for Adult Offender Supervision."

Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 5, Darnell M. Goings, Offender's

Application for Interstate Compact Transfer, Sept. 21, 2010. The plaintiff also signed a

statement in the same application indicating that: "I understand that my supervision in another

state may be different than the supervision I would be subject to in [Florida]. I agree to accept

any differences that may exist because I believe that transferring my supervision to [the receiving

state] will improve my chances for making a good adjustment in the community. I ask that the

authorities to whom this application is made recognize this fact and grant my request for transfer

of supervision." *Id.*

    Since the plaintiff was a District of Columbia resident at the time of his arrest and

incarceration, the plaintiff's transfer to District of Columbia was mandatory under the Compact.[3]

Cole. Decl., ¶¶ 14-15. When the plaintiff was released from prison on October 19, 2010, he was

transferred to the District of Columbia and placed under the authority of CSOSA. *Id.* at ¶¶ 15-

16; Compl., ¶¶ 39-40.

    CSOSA is a federal agency that, *inter alia*, supervises "offenders on parole, probation,

and supervised release from jurisdictions outside the District of Columbia who seek to reside in

the District of Columbia." D.C. CODE § 24-133(b)(2)(I). Community Supervision Officers

manage offenders in the District and are given "the same powers and authority as are granted by

law to United States Probation and Pretrial Officers." D.C. CODE § 24-133(d). CSOSA also

supervises the District of Columbia's sex offender registration process, *see* D.C. CODE § 24-

---

[3] The defendant states that it initially rejected plaintiff's application for transfer to D.C. because of its "concerns regarding his offense against a minor and abuse of his position as a correctional officer." Def.'s Opp'n Mem., at 9; Cole Decl., ¶ 15. The plaintiff's transfer to D.C. was mandatory, however, under the Interstate Compact because the plaintiff was a District of Columbia resident. Cole Decl., ¶ 15.

133(c)(5), and has a Sex Offender Unit, which manages sex offenders on probation, parole, or supervised release. Cole Decl., ¶ 5.

CSOSA's Sex Offender Unit follows "a specific protocol" for each sex offender under its supervision. Cole Decl., ¶ 7. Sex offenders referred to the Unit undergo an "initial risk assessment," which is used to "establish treatment and risk management plans that adequately address the offender's risk level and needs going forward." *Id.* According to the defendant, the risk assessment is "particularly crucial when CSOSA is dealing with an offender who comes to the District of Columbia from another state, because it will be the first time that CSOSA has an opportunity to assess the offender and determine the risk the offender poses to the community." Def.'s Mem. Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, (hereinafter "Def.'s Opp'n Mem."), at 3. The assessment phase includes routine meetings with CSOSA officers and treatment providers from the Center for Clinical and Forensic Services, a contract treatment provider utilized by CSOSA, as well as a review of the offender's sexual history, including polygraph tests to verify offender's sexual history and tendencies. Cole Decl., ¶ 7.

**B.  CSOSA Initial Risk Assessment and Special Conditions of Plaintiff's Probation**

A day after his transfer to the District of Columbia, on October 20, 2010, the plaintiff met with CSOSA's Supervisory Community Supervision Officer Aprille Cole.  Compl., ¶ 40.  As part of her initial review of the case, Ms. Cole determined that the plaintiff should be subject to certain conditions pending completion of CSOSA's initial risk assessment. Cole Decl., ¶¶ 19, 21-26.  Ms. Cole verbally directed the plaintiff to move out of his house, where he was living again with his fiancée and two of his children, and further informed him that he could not have any contact with his children. Compl., ¶ 40; Goings Decl., ¶ 8. This order was the first notice the

plaintiff received of any sex offender conditions being placed upon him. Compl., ¶ 40; Goings

Decl., ¶ 8.

On November 12, 2010, CSOSA provided the plaintiff with a Compact Action Request

listing seventeen "special conditions" that were imposed on the plaintiff during completion of his

initial risk assessment. Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 6, Compact Action

Request dated Oct. 29, 2010. These special conditions included the following six conditions

which are challenged in plaintiff's Complaint:

- Special Condition 2: "You shall undergo evaluation and complete sex offender therapy, to include submitting to polygraph exams, if deemed appropriate by CSOSA . . . ."

- Special Condition 7: "You shall comply with Global Positioning System (GPS) monitoring to enforce a curfew and/or exclusion zones, if deemed appropriate by CSOSA."

- Special Condition 9: "You shall not possess or use a computer with access to any online computer service at any location (including employment) without the written consent of CSOSA . . ."

- Special Condition 15: "You shall have no unsupervised contact with children under the age of 18 without knowledge and permission from CSOSA."

- Special Condition 16: "You shall not spend time at or loiter near places primarily used by minor children (i.e. schoolyards, swimming pools, playgrounds, public libraries, arcades, etc.) unless approved by CSOSA."

- Special Condition 17: "You shall not be employed, volunteer, or otherwise participate in activities where you have interaction with minor children unless approved by CSOSA."

*Id.* (hereinafter "the Challenged Conditions").

When he was provided with the Compact Action Request, the plaintiff was orally

informed that Special Condition 15 extended to his own children.  In other words, CSOSA

prohibited the plaintiff from having any contact, not even by telephone, mail, or electronic

communication, with his children. Goings Decl., ¶¶ 8, 12. The plaintiff was told that CSOSA's

supervising officers would determine if and when these conditions would be removed. *Id.* at ¶ 12. The plaintiff was required to sign the Compact Action Request and initial each of the seventeen conditions. Cole Decl., ¶ 19; Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 6, Compact Action Request dated Oct. 29, 2010.

During the plaintiff's initial risk assessment, the plaintiff met with treatment providers from the Center for Clinical and Forensic Services once per week for thirteen weeks. At the end of this assessment, on January 9, 2011, the plaintiff took a polygraph test, in which he was asked a number of questions regarding his sexual history. Cole Decl., ¶ 28; Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 8, Report of Polygraph Examiner Myron A. Moore Re: Sexual History Polygraph Examination: Darnell Michael Goings, Jan. 9, 2011 (hereinafter "January 2011 Polygraph Report"). During this polygraph, the plaintiff indicated that he only had sexual relations with two minors while he was an adult. January 2011 Polygraph Report, at 4-5. According to the polygraph report, the plaintiff had deceptively answered "no" to the question: "Since becoming an adult, have you had any sexual contact with any minor that we have not discussed?" *Id.*; Cole Decl., ¶ 29.

Due to the plaintiff's deceptive answer on his polygraph examination, CSOSA did not complete the plaintiff's initial risk assessment and the special conditions imposed upon him remained in effect. Cole Decl., ¶ 30. On February 28, 2011, the plaintiff took another polygraph test, in which he admitted that he had sexual relations with six minors since his eighteenth birthday. Def.'s Opp'n Pl.'s Mot. Prelim. Inj., ECF No. 10, Ex. 9, Report of Polygraph Examiner Myron A. Moore Re: Sexual History Polygraph Examination: Darnell Michael Goings, Feb. 28, 2011 (hereinafter "February 2011 Polygraph Report"). Three of these instances took place when the plaintiff was eighteen and the minors were seventeen. *Id.* at 2. Another took place when the

plaintiff was nineteen and the minor was seventeen.  *Id.*  The remaining two took place when the plaintiff was twenty-two and one of the minors was seventeen and the other was between seventeen and twenty years old.  *Id.*

On March 14, 2011, after the plaintiff had filed this lawsuit, CSOSA's treatment providers at the Center for Clinical and Forensic Services provided the agency with their assessment of the plaintiff.  Def.'s Treatment Provider Report.  The report states that "the vast majority of [the plaintiff's] sexual partners have been his contemporaries, with the only exceptions having been the girls involved in the referral offense. As such, there is no evidence to suggest that he has a sexual preference for minors."  *Id.* at 5. The report described the plaintiff as a "situational offender" and "the most salient dynamics immediately preceding [the plaintiff's] offense seem to have been his level of immaturity, his casual approach to sex and the distress he was experiencing in his relationship at the time." *Id.* The report further indicated that, based on the current information available about the plaintiff, he would receive the lowest rating for risk of recidivism.  *Id.* As part of the clinicians' recommendation, however, they stated that the plaintiff should, *inter alia*, participate in a sexual offender treatment program, and should not have unsupervised contact with minors until he engages in "the treatment process and has full understanding and management of his risk factors." *Id.* at 6. They recommended that this condition, however, be "evaluated on an on-going basis." *Id.*

On March 22, 2011, while briefing on the plaintiff's motion for a preliminary injunction was underway, CSOSA completed its initial risk assessment and determined that the plaintiff was a "situational offender" who "do[es] not have a primary preference for children." Cole Decl., ¶ 32.  The defendant then moved the plaintiff into "phase 2 of sex offender treatment" and lifted Special Condition 9, which prohibited the plaintiff from owning and using a computer, and

modified Special Condition 15 (hereinafter the "No Contact Provision") to allow the plaintiff to have written and oral communication with his children, as well as supervised contact with his children "once an appropriate chaperone is identified." *Id.* at ¶¶ 32-40.

## C. Plaintiff's Legal Challenge

On February 7, 2011, before completion of plaintiff's initial risk assessment, plaintiff's counsel called CSOSA to express concerns about the Challenged Conditions and to seek a review of CSOSA's actions. Compl., Ex. 8, Letter form David Taylor to Gladys Dorgett, CSOSA Branch Chief, and Timothy Brown, Supervisor Sex Offender Unit, dated Feb. 9, 2011 (hereinafter "Pl.'s Letter to CSOSA"). The plaintiff's counsel then, at CSOSA's request, sent the agency a letter requesting modification or removal of the challenged conditions, stating: "While I hope that we can work together informally to arrange for a more reasonable set of probation conditions, if that cannot be done in a timely fashion I will have no choice but to seek redress in the courts on Mr. Goings' behalf." Pl.'s Letter to CSOSA, at 3. The agency did not respond. Compl., ¶ 47.

Accordingly, one month later, on March 9, 2011 the plaintiff filed a Complaint alleging that CSOSA imposed Special Conditions 2, 7, 9, 15, 16, and 17 on him in violation of the Fifth Amendment's Due Process Clause. Specifically, the plaintiff argues that the No Contact Provision, violates his substantive due process rights in so far as it restricts his ability to interact and communicate with his children. The plaintiff further alleges that the No Contact Provision, along with the five other Challenged Conditions,[4] were "not imposed by the order of any court, nor have they been reviewed by any court. Instead, CSOSA itself imposed the conditions without

---

[4] Special Conditions 2, 7, 9, 16, and 17, respectively, order plaintiff to undergo sex offender therapy, to wear a GPS tracking device, not to possess a computer without CSOSA permission, not to loiter near places trafficked by minors, and not to seek employment or participate in activities that involve minors.

providing [the plaintiff] any opportunity to object prior to their imposition [and] CSOSA has [], itself claimed the right to modify, relax, or remove the conditions." Compl., ¶ 46. The Challenged Conditions, plaintiff argues, were therefore imposed in violation of the procedural component of the Due Process Clause of the Fifth Amendment.

Along with his Complaint, on March 9, 2011, the plaintiff simultaneously filed a motion for a preliminary injunction to enjoin the defendant from continued enforcement of the Challenged Conditions. ECF No. 2. The Court then ordered the parties to confer on a joint briefing schedule, which was subsequently adopted by the Court. Minute Order dated March 14, 2011; Joint Status Report Regarding Briefing Schedule for Pl.'s Mot. Prelim. Inj., Mar. 16, 2011, ECF No. 6; Minute Order dated Mar. 17, 2011. On March 25, 2011, a day before the defendant's opposition to the plaintiff's motion for preliminary injunction was due, CSOSA lifted Special Condition 9, allowing the plaintiff to use and own a computer,[5] and modified the No Contact Provision so as to allow the plaintiff to write and orally communicate with his children, and to have supervised physical contact with his children when CSOSA approves a chaperone. Cole Decl., ¶¶ 36, 40. The plaintiff filed a reply to the defendant's opposition brief, after requesting an extension, on April 8, 2011, ECF No. 17, and the Court held oral arguments on plaintiff's motion for preliminary injunction on April 15, 2011.

The Court now considers the plaintiff's motion for a preliminary injunction, and, for the following reasons, grants the plaintiff's request to enjoin the defendant from enforcing the No Contact Provision, as it applies to the plaintiff's children, because the provision appears to violate the plaintiff's constitutional rights as protected by the substantive component of the Due Process Clause. The Court denies the plaintiff's request to enjoin enforcement of the remaining

_____

[5] During Oral argument, the plaintiff withdrew his legal challenge to Special Condition 9 (no unsupervised computer use) since CSOSA lifted the condition. The plaintiff therefore proceeds with its challenge of only five Special Conditions: 2, 7, 15, 16, and 17.

Challenged Conditions because, although the plaintiff has demonstrated a likelihood of success on these claims and is suffering irreparable harm, the public interest weighs against granting the plaintiff the relief he seeks because the record before the Court is currently incomplete with regard to the potential scope and impact of a Court ruling in the plaintiff's favor.

## II.  STANDARD OF REVIEW

To warrant injunctive relief, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It is an extraordinary form of interim relief, however, and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations omitted). The court must balance the strengths of the four preliminary injunction factors, and this Circuit has typically employed a "sliding scale" approach whereby an unusually strong showing on one factor may obviate the need for a strong showing on another. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C.Cir.2009) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C.Cir.1999)); *Ass'n of Cmty. Orgs. for Reform Now v. FEMA*, 463 F. Supp. 2d 26, 33 (D.D.C. 2006) (citing *Serono Labs v. Shalala,* 158 F.3d 1313, 1318 (D.C. Cir. 1998)); *Northern Air Cargo v. U.S. Postal Service*, No. 10-2076, 2010 WL 5209340, at *3 (D.D.C. Dec. 23, 2010). It is unclear, however, whether the "sliding scale" approach is controlling after the Supreme Court's decision in *Winter v. NRDC*, which emphasized that irreparable injury must be likely and

not just a "possibility." 129 S. Ct. at 375-376. Although the D.C. Circuit has noted that *Winter* "does not squarely discuss whether the four factors are to be balanced on a sliding scale," it has yet to decide whether the sliding-scale approach should still be employed. *Davis*, 571 F.3d at 1292 (declining to address validity of sliding-scale approach because plaintiffs failed even under the more lenient sliding-scale analysis); *Sherley v. Sebelius*, No. 10-5287, 2011 WL 1599685, at *4 (D.C. Cir. Apr. 29, 2011) (declining to address continued validity of sliding scale approach, but stating "we read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction,'" quoting *Davis,* 571 F.3d at 1296 (concurring opinion)).[6]

The Court, however, need not decide whether the sliding-scale approach continues to be controlling, because the outcome for the plaintiff's claims here would be the same under either test. The plaintiff is entitled to a preliminary injunction on his substantive due process claim under the stricter test requiring all four preliminary injunction elements. He is not entitled to a preliminary injunction on the remaining claims, even under a more lenient sliding-scale approach, because when an injunction would "adversely affect a public interest . . . even temporarily . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Yakus v. United States*, 321 U.S. 414, 440-41 (1944). The Court may thus deny injunctive relief, even

---

[6] Other Circuits have continued to employ the sliding scale approach. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) ("the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35-38 (2d Cir. 2010) ("We have found no command from the Supreme Court that would foreclose the application of our established ["serious questions" sliding scale] standard as a means of assessing a movant's likelihood of success on the merits."); *Hoosier Energy Rural Elec. Coop. Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009) ("How strong a claim on the merits is enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."); *see also Winter*, 129 S. Ct. at 392 (Ginsburg, J., dissenting) ( "Court has never rejected [the sliding-scale] formulation, and I do not believe it does so today."); *but see Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010) (holding the "balance-of-hardship" sliding scale approach to be invalid post-*Winter*).

when private rights are implicated, because courts in equity "may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Id.* at 441 (citing *Virginian Ry. Co. v. System Fed'n No. 40*, 300 U.S. 515, 552 (1937)).

## III.    DISCUSSION

The plaintiff's motion for injunctive relief requires the Court to assess prospectively the merits of the plaintiff's legal challenge and the need for immediate judicial intervention. The Court finds that the plaintiff has demonstrated a likelihood of success that the No Contact provision violates the substantive component of the Due Process Clause in so far as it restricts the plaintiff's ability to interact with his own children, and has also demonstrated a likelihood of success that Special Conditions 7, 15, 16 and 17 were imposed in violation of the plaintiff's procedural due process rights. The plaintiff has further established that without equitable relief enjoining enforcement of these conditions, he faces irreparable injury. Based on the current record, however, the Court only grants the plaintiff's motion for injunctive relief on his substantive due process claim to enjoin CSOSA from applying the No Contact Provision to restrict the plaintiff's access to his children. Regarding the plaintiff's procedural due process claim, the Court finds that significant constitutional and statutory issues regarding the scope and impact of a Court ruling on the matter remain unaddressed by the parties, and the record before the Court is incomplete, making judicial intervention prior to a full hearing on the merits of this claim inappropriate and against the public interest.

Prior to discussing the preliminary injunction factors, the Court first addresses three threshold issues raised by the defendant as grounds to deny consideration of plaintiff's motion for a preliminary injunction. Specifically, the defendant contends that plaintiff's claims should be

barred as moot, as an improperly asserted petition for habeas relief, or under the doctrine of "unclean hands," due to the plaintiff's omission of material facts in his moving papers.

### A. The Plaintiff's Challenge is Not Moot

First, the defendant asserts that the plaintiff's challenge is moot given the agency's post-Complaint filing modification of two of the Challenged Conditions. The plaintiff's challenge, however, is not moot because the defendant only modified a portion of the Challenged Conditions, and, even with respect to the modified conditions, the Court is authorized to adjudicate the plaintiff's claims because the defendant's subsequent modification of the conditions amounts to a voluntary cessation, and thus falls squarely into an exception to the mootness doctrine.

Under Article III of the United States Constitution, the Court "may only adjudicate actual, ongoing controversies." *District of Columbia v. Doe*, 611 F.3d 888, 894 (D.C. Cir. 2010) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). The mootness doctrine prohibits the Court from deciding a case if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Id.* (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)).

An exception to the mootness doctrine applies, however, when a party's "voluntary cessation" of the challenged conduct is the basis for the mootness argument.[7] A defendant's "voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and

---

[7] A second exception to the mootness doctrine has been recognized if actions are "capable of repetition, yet evading review." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam); *District of Columbia v. Doe*, 611 F.3d at 894. This exception applies where: "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *District of Columbia v. Doe*, 611 F.3d at 894 (quotation omitted). The defendant contends that this exception does not apply here because the No Contact Rule, including application to plaintiff's children, was in place only during the "initial risk assessment," which "only happens once." Def.'s Mem. Opp'n, at 16. Since the voluntary cessation exception to the mootness doctrine applies, the Court does not have to reach the issue of whether another exception also applies to make review of plaintiff's claims appropriate.

determine the case." *Cnty. of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979). "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citing *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 n.10 (1982) and *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953)). Voluntary cessation will moot a case only if (1) "there is no reasonable expectation . . . that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis,* 440 U.S. at 631; *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008). The defendant carries the burden of demonstrating "that there is no reasonable expectation that the wrong will be repeated," and "[t]he burden is a heavy one." *Am. Bar Ass'n v. FTC,* No. 10-cv-5057, 2011 WL 744659 (D.C. Cir. Mar. 4, 2011) (quoting *W.T. Grant Co.,* 345 U.S. at 633); *see also Friends of the Earth*, 528 U.S. at 189 ("A case might become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." (emphasis added) (quotation and citation omitted)). The application of the "voluntary cessation" exception to the mootness doctrine to both plaintiff's substantive and procedural due process claims is discussed below.

### 1. Plaintiff's Substantive Due Process Challenge Is Not Moot

The defendant argues that the plaintiff's challenge to the No Contact Provision is moot because, since the plaintiff filed this case, CSOSA modified the condition so as to allow the plaintiff to contact his children by mail and telephone, and to have supervised physical contact with his children "once a chaperone agreement is put in place." Cole Decl. ¶¶ 32, 36. Although CSOSA modified the No Contact Provision, the plaintiff argues that he challenges the constitutionality of the entire No Contact prohibition in so far as it restricts his ability to interact

and live with his children. This prohibition is still in effect, despite the modification of the No Contact Provision, because the plaintiff remains unable to have unsupervised contact with his children and cannot reside with them on a permanent basis. Pl.'s Reply Mem., at 3. Even with regard to the lifted portions of the No Contact Provision, namely the prohibition of making any written or oral communication with his children, the plaintiff argues that the legal challenge is not moot because the defendant is not prevented from re-imposing those conditions at a later date. *Id.* at 4-5.

The Court agrees that plaintiff's challenge of the No Contact Provision is not moot. The plaintiff has challenged the constitutionality of the entire No Contact Provision in so far as it restricts his freedom to interact with his children, not simply the prohibitions on written and oral communication. The plaintiff's Complaint alleges that that the No Contact Provision has "deprived Mr. Goings of his fundamental right to maintain a relationship with his children," Compl. ¶ 49, and has forced the plaintiff to "live apart from his fiancée, who resides with and cares for (now by herself) the couple's two children." *Id.* at ¶ 5. CSOSA still will not allow the plaintiff physical contact with his children, supervised or unsupervised, and the injury to the plaintiff from the No Contact Provision is therefore ongoing.

A party's voluntary cessation of challenged conduct will become moot only if there is no reasonable expectation that the alleged violation will recur and interim events have completely and irrevocably eradicated the effects of the alleged violation. *See Davis,* 440 U.S. at 631. Neither requirement is met here. First, CSOSA's Supervisory Officer, Aprille Cole, states that the conditions placed on the plaintiff's probation are assessed on "an ongoing basis" and under a "fluid" case management system, which would allow for previously lifted conditions to be re-imposed. Cole Decl., ¶¶ 2, 6. In short, CSOSA remains free to re-impose conditions banning the

plaintiff from any oral and written communication with his children and also remains free to revoke the "chaperone agreement" at any point in the future. Second, there have been no intervening events to rectify the plaintiff's alleged injury. Although the defendant will apparently allow the plaintiff to have supervised contact with his children when a chaperone agreement is in place at some point in the future, the defendant remains unable to have unsupervised contact with his children, and CSOSA's Supervisory Officer states that there is even a "concern" about allowing the plaintiff's fiancée to serve as a chaperone. *Id.* at ¶ 36.

Despite modification of the No Contact Provision, the plaintiff's injury has not been rectified and the defendant leaves open the possibility that it could re-impose the lifted No Contact conditions. The Court therefore finds that the plaintiff's claim that the No Contact Provision violates the Fifth Amendment's Due Process Clause is not moot, despite CSOSA's modification of those conditions, and the Constitution does not bar the Court from adjudicating the plaintiff's substantive due process claim.

### 2. Plaintiff's Procedural Due Process Challenge Is Not Moot

The defendant contends that the plaintiff's procedural due process claim regarding the Challenged Conditions is moot because the plaintiff had an opportunity to be heard and provide input and information during CSOSA's initial risk assessment. Def.'s Opp'n Mem., at 17-18. The defendant claims that the plaintiff met regularly with treatment providers and CSOSA officers, and, additionally, had opportunities to provide information "through counsel." *Id.* at 18. Thus, according to the defendant, there is "[n]o question that plaintiff was afforded a meaningful opportunity to be heard at a meaningful time before CSOSA imposed the current conditions." *Id.*

As the plaintiff correctly notes in his Reply brief, the defendant's argument that the plaintiff's claim is moot is "not a mootness argument at all." Pl.'s Reply Mem., at 6. The

defendant does not assert that there is no longer an on-going controversy regarding whether the plaintiff was afforded sufficient process before CSOSA imposed the Challenged Conditions, almost all of which remain in effect. Rather, the defendant contends that the plaintiff was afforded sufficient process. This is an argument on the merits of the plaintiff's claim, which is precisely the dispute that the Court is tasked with deciding. Therefore, the plaintiff's procedural due process claim is not moot.

### B. The Plaintiff's Complaint is a Not "Effectively" a Writ of Habeas Corpus

As a second threshold issue, the defendant argues that the Court should not grant the plaintiff's motion for injunctive relief because the Court should treat the plaintiff's Complaint as a petition for habeas corpus subject to the rules set forth in 28 U.S.C. § 2241, *et seq*. The defendant does not explain how the Court's review would be limited by these rules or why, if the defendant were correct, the Court's review of the plaintiff's complaint would be barred. In any event, the defendant is wrong. The plaintiff's claim is not "effectively [] a writ of habeas corpus," Def.'s Opp'n Mem., at 20, and the defendant's argument that the Court should refuse to grant the plaintiff relief based on a mischaracterization of the Complaint is unavailing.

Habeas corpus provides a means for individuals held in government custody to challenge the lawfulness of their detention and to secure release from illegal custody. 28 U.S.C. § 2241(c); *Munaf v. Geren*, 553 U.S. 674, 693 (2008) ("Habeas is at its core a remedy for unlawful executive detention. The typical remedy for such detention is, of course, release."); *Preiser v. Rodriguez,* 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."). In the instant case, there is no dispute that the plaintiff is in government custody. *See, e.g., Jones v. Cunningham*, 371 U.S. 236, 243 (1963) ("While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions

which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' . . . within the meaning of the habeas corpus statute . . ."); *Ramsey v. Reilly*, 613 F. Supp. 2d 6, 9 (D.D.C. 2009) ("An individual who is on parole is considered to be 'in custody' for the purposes of *habeas corpus* relief . . .").

The plaintiff, however, does not challenge the validity of his underlying conviction, nor does he seek a general release from his five-year probation sentence. Rather, the plaintiff asserts that the specific conditions which were imposed upon him are unconstitutional, either because they are not reasonably related and narrowly tailored, or because the plaintiff was not afforded an opportunity to be heard before those conditions were imposed. *See* Compl. ¶¶ 48-57. If the Court granted the plaintiff's motion for a preliminary injunction, he would remain under CSOSA's authority, and CSOSA would be free to impose any probation condition upon the plaintiff, provided that those conditions are appropriate and pass constitutional muster. *See Heck v. Humphrey,* 512 U.S. 477, 487 (1994) (discussing availability of § 1983 claims and stating that "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed . . . .").

The defendant mischaracterizes the plaintiff's Complaint as a habeas petition since the plaintiff does not seek to secure his general release or invalidate his underlying conviction. *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) ("constitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of that core [of habeas corpus]"); *Wilkinson v. Dotson,* 544 U.S. 74, 82 (2005) ("Because neither prisoner's claim would necessarily spell speedier release, neither lies at the

core of habeas corpus.") (internal quotations and citations omitted).  The Court therefore finds

that the plaintiff's Complaint is not a habeas petition.

### C.  Unclean Hands Does Not Preclude the Plaintiff's Legal Challenge

As a final threshold argument, the defendant argues that the plaintiff should be precluded

from seeking a preliminary injunction because of the doctrine of unclean hands, which generally

states that "he who comes into equity must come with clean hands." *Precision Instrument Mfg.*

*Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  Specifically, the defendant argues that

the plaintiff failed to include "several material facts" regarding the plaintiff's criminal and sexual

past. Def.'s Opp'n Mem., 13. These facts are that the plaintiff had sexual contact with a second

underage inmate while working as a corrections officer in the Florida prison, that the plaintiff

had sexual relations with five other minors since he became eighteen, that the plaintiff was

involved in two instances of domestic violence, and the fact that he was deceptive in answering

one question in his January 2011 polygraph test.  *Id.* at 13-14.  CSOSA contends that omission of

these facts corroborates the agency's determination that the plaintiff is "'extremely manipulative'

and 'selective about the information he divulges.'"[8] *Id.* at 19.

The basis for the defendant's argument about "unclean hands" is the plaintiff's failure to

include these facts in his Complaint and motion for preliminary injunction, but the defendant

omits important context for the plaintiff's purported material omissions.  The plaintiff's failure to

provide the omitted information identified by CSOSA to the Court would be troubling if the

plaintiff had any indication that CSOSA relied upon these facts to justify the Challenged

Conditions and that the omitted information could therefore be relevant for the Court's review of

---

[8] Despite the deceptive response to a single question in the January 2011 polygraph test, the defendant does not
dispute that the plaintiff fully cooperated with CSOSA treatment providers and was truthful regarding the
information he provided them.  In fact, CSOSA's treatment providers state in their "Risk Assessment" report that the
plaintiff was "cooperative" and disclosed all the information regarding his sexual past. Def.'s Treatment Provider
Report, at 1-3.

the agency's action. CSOSA, however, provided the plaintiff *no* information regarding its rationale for implementing the Challenged Conditions until he filed a Complaint with this Court. In fact, the defendant did not even respond to the plaintiff's letter asking CSOSA to explain the imposed conditions and consider modification. Pl.'s Letter to CSOSA. The plaintiff certainly cannot be accused of unclean hands when the defendant refused to provide any information regarding the justification of the imposed conditions and left the plaintiff speculating about what information the defendant relied upon that should be addressed in his briefs. Accordingly, the Court rejects the defendant's contention that unclean hands should prevent the Court from granting the plaintiff an injunction.

### D. Plaintiff's Likelihood of Success on the Merits

To determine whether judicial intervention prior to a full hearing on the merits of the plaintiff's claim is warranted, the Court must assess whether that the plaintiff has a likelihood of success when his claims are ultimately decided. The Court therefore evaluates the plaintiff's prospect of success for each of his constitutional claims, but first addresses the defendant's contention that the plaintiff will not be successful because he "consented" to the imposition of the Challenged Conditions. *See* Def.'s Opp'n Mem., at 28-30.

### 1. The Plaintiff Did Not Consent to the Challenged Conditions

The defendant contends that by requesting a transfer to the District of Columbia under the ICAOS, and by signing and initialing each of the seventeen special conditions set forth in the Compact Action Request, the plaintiff "knowingly waived any constitutional rights he may have had." *Id.* at 28. The plaintiff counters that by requesting transfer to the District of Columbia, he did not consent to the enforcement of unconstitutional probation. Pl.'s Reply Mem., 10-12. The Court agrees with the plaintiff that he did not consent to the imposition of unconstitutional conditions and the defendant's argument is therefore unavailing.

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). By signing the Interstate Compact Transfer Application on September 21, 2010, and requesting a transfer to the District of Columbia, the plaintiff acknowledged that the District of Columbia could impose different conditions upon him. The plaintiff's awareness that the District of Columbia could impose different conditions is a far cry from being on notice that the receiving jurisdiction would impose conditions directly contrary to the Florida judge's express order that "no sex offender conditions while on prob[ation]" were to be imposed. Compl., Ex. 5, Franklin Cnty., Florida Circuit Court, Court Minutes Disposition, Aug. 27, 2010. Moreover, plaintiff's acknowledgement of the District of Columbia's authority to impose different conditions did not constitute consent to CSOSA's imposition of sex offender conditions without affording him sufficient process or in violation of the substantive component of the Due Process Clause. In short, the plaintiff did not voluntarily, knowingly, and intelligently waive his right to contest the constitutionality of conditions imposed upon him by applying for transfer because he could not have known CSOSA would modify the sentencing court's order without sufficient process and deny him his Fifth Amendment due process rights. *See Doe v. Pennsylvania Bd. of Prob. and Parole*, 513 F.3d 95, 99 n.2 (3d Cir. 2008) (offender transferred under the Interstate Compact did not waive his right to contest conditions of his probation that he was not informed of until several months after his transfer).

The defendant relies on *Stephenson v. Taylor*, No. 06-816, 2007 WL 1068247 (D.S.C. Mar. 30, 2007) and *State of Iowa v. Warner*, No. 8-864, 2008 WL 5009279 (Iowa Ct. App. Nov. 26, 2008) as support for the broad proposition that offenders seeking transfer under the Interstate

Compact waive the right to contest the conditions imposed upon them by the receiving state. These cases are inapposite. In *Stephenson*, the petitioner, who was incarcerated for a revocation violation, challenged, *inter alia*, a no-contact-with-minors probation condition imposed by a receiving state, following his transfer under the Interstate Compact for the Supervision of Parolees and Probationers.[9] The court held that "these issues were not raised in the direct appeal and are thus barred." *Stephenson*, 2007 WL 1068247 at *4. In dicta, the court pointed out that the petitioner had acknowledged when he applied for supervision in the receiving state that there may be "certain differences" in supervision. The court did not discuss in detail the "fundamentally protected civil rights" that may be implicated by the no contact condition in circumstances where the petitioner married an underage girl, noting only that his "probation was not revoked for the marriage itself," but rather for violations of the original standard conditions of probation imposed by the sentencing court. *Id.* at *5. Thus, this case simply does not stand for the legal holding urged by the defendant that offenders requesting a transfer of probation waive their constitutional rights to any new probation condition unilaterally imposed by the receiving state.

Likewise, in *Warner*, the defendant pleaded guilty to practicing medicine without a license and was sentenced, *inter alia*, to three-years' probation. The sentencing court declined to impose the condition that the defendant be evaluated for placement in a sex offender treatment program. *Warner*, 2008 WL 5009279 at *2. Nevertheless, upon transfer, the receiving state placed the defendant on a sex offender registry. The court in the sending state refused to order the receiving state not to "require him to complete a sexual evaluation" since under the ICAOS

---

[9] The Interstate Compact for the Supervision of Parolees and Probationers was in effect between 1937 and 2002, when it was superseded by the ICAOS. ICAOS HISTORY, INTERSTATE COMMISSION FOR ADULT OFFENDER SUPERVISION, www.interstatecompact.org/abouthistory.aspx (last visited May 3, 2011).

the receiving state is "free to supervise [defendant] as they see fit." *Id*. at *5. The court noted that the defendant had been alerted at his sentencing hearing that he would be subject to the receiving state's supervision conditions. *Id*. The court did not otherwise make any findings about the constitutionality of the probation conditions imposed by the receiving state or about whether the defendant waived his constitutional rights by requesting transfer of his probation.[10]

In short, neither of the cases relied upon by the defendant address the issue at stake in this case: namely, whether a request for transfer under the ICAOS constitutes a complete waiver of constitutional rights and consent by an offender to any probation condition imposed by a receiving state, regardless of its appropriateness or constitutionality.

Finally, the defendant's reliance on the fact that the plaintiff initialed and signed the Compact Action Request delineating the seventeen special conditions on November 12, 2010, as grounds that the plaintiff consented to or waived any challenge to those conditions is also unavailing. According to CSOSA Officer Cole, the plaintiff "specifically put his initials next to each condition [to] demonstrate[] that he understood and agreed to abide by each condition." Cole Decl., ¶ 19. The plaintiff was not informed that he was waiving his rights to contest these provisions, and it appears that CSOSA requested the plaintiff's signature not as a waiver, but rather as a means of ensuring that the plaintiff was aware of the conditions imposed upon him and could not, at some later date, disavow knowledge of the probation conditions. This does not

---

[10] The same defendant subsequently challenged the constitutionality of the probation conditions imposed by the receiving state on procedural due process grounds because "he 'was not afforded a hearing to determine the appropriateness of his probation sentence.'" *Warner v. McVey*, No. 08-55, 2010 U.S. Dist. LEXIS 83582, at *31 (W.D. Pa. July 9, 2010) (Mag. J. Report and Recommendation) *adopted by Warner v. McVey*, No. 08-55, 2010 U.S. Dist. LEXIS 83507 (W.D. Pa. Aug. 16, 2010). His motions for injunctive and declaratory relief were denied as moot since he was no longer on probation, and his motion for summary judgment was denied on grounds that the defendants named had immunity under the Eleventh Amendment or qualified immunity, or no personal involvement in the complained-of misconduct. 2010 U.S. Dist. LEXIS 83582 at *27, *31, *46. Consequently, the court did not reach the merits of his constitutional challenge.

constitute a waiver of any right to challenge those conditions.  Accordingly, the Court now addresses the plaintiff's specific constitutional claims.

### 2. The Plaintiff is Likely to Succeed on His Claim that the No Contact Provision Violates the Substantive Component of the Due Process Clause

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.  The Due Process Clause includes a "substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."[11] *Reno v. Flores,* 507 U.S. 292, 301-302 (1993) (emphasis in original).  Conditions of supervised release or probation that implicate fundamental liberty interests must comply with this standard.  *See United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005) (explaining that a supervised release condition "that restricts fundamental rights must be narrowly tailored."); *United States v. Loy,* 237 F.3d 251, 256 (3d Cir. 2001) ("a condition that restricts fundamental rights must be narrowly tailored and directly related to deterring the defendant and protecting the public." (internal quotation omitted)).

In its brief, CSOSA urges the Court to apply the standard set forth in 18 U.S.C. § 3583(d) in evaluating the legality of the probation conditions imposed on out-of-state offenders transferred to the District of Columbia under the ICAOS. Def.'s Opp'n Mem., 31-32.  Generally,

---

[11] The Supreme Court has explained that the "criteria to identify what is fatally arbitrary [as a violation of substantive due process] differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  In cases in which a plaintiff alleges that specific conduct by a government official violates substantive due process, courts ask whether the official's behavior is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006) (quotation and citation omitted); *see also Rochin v. California*, 342 U.S. 165, 172 (1952) (deputy sheriff's forced pumping of suspect's stomach shocked the conscience and violated due process). Unlike the specific actions of government officials, conditions of supervised release and probation that implicate fundamental liberty interests are reviewed under the "narrowly tailored" standard. *See*, *e.g.*, *United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005); *United States v. Loy,* 237 F.3d 251, 256 (3d Cir. 2001).

federal supervised release conditions must conform to the three-part standard delineated in 18 U.S.C. § 3583(d). *See United States v. Love*, 593 F.3d 1, 11 (D.C. Cir. 2010); *United States v. Stanfield*, 360 F.3d 1346, 1352-53 (D.C. Cir. 2004). This statutory standard requires, *inter alia*, that a supervised release condition must be "reasonably related" to the nature and circumstances of the offense and other pertinent factors, that it impose "no greater deprivation of liberty than is reasonably necessary" to advance deterrence, the protection of the public, and the defendant's correctional needs, and that it be consistent with pertinent policy statements issued by the U.S. Sentencing Commission. 18 U.S.C. § 3583(d)(1)-(3).[12]

D.C. law, however, does not mandate that CSOSA be guided by the standard set forth under 18 U.S.C. § 3583(d), nor does it provide any guidance to CSOSA itself in determining what conditions are appropriate to impose on probationers. This is for the simple reason that CSOSA is not permitted to exercise this discretion for in-state offenders; rather, the agency only has authority to enforce conditions set by the D.C. Superior Court. *See* D.C. CODE § 24-133(c)(3) ("The Agency shall carry out the conditions of release imposed by the Superior Court . . ."). Similarly, CSOSA does not have authority to set conditions of release for in-state offenders on supervised release following incarceration.[13] Thus, in contrast to in-state offenders whose

---

[12] This federal statutory standard appears consistent with that set forth by the D.C. Court of Appeals for in-state offenders. *Belay v. District of Columbia*, 860 A.2d 365, 369 (D.C. 2004) (all probation conditions in the District of Columbia must be "reasonably related to the rehabilitation of the defendant and the protection of the public.") (citing *Hill v. United States*, 529 A.2d 788, 790 (D.C. 1987) and *Brown v. United States*, 579 A.2d 1158, 1159 (D.C.1990)); *see also Gotay v. United States*, 805 A.2d 944, 946 (D.C. 2002).

[13] Under D.C. law, offenders on supervised release are subject to the authority of the U.S. Parole Commission, which must exercise its authority in accordance with the standard set forth in 18 U.S.C. § 3583. D.C. CODE § 24-403.01(b)(6) ("Offenders on supervised release shall be subject to the authority of the United States Parole Commission until completion of the term of supervised release. The Parole Commission shall have and exercise the same authority as is vested in the United States District Courts by 18 U.S.C. § 3583(d)-(i) . . ."); D.C. CODE § 24-133(c)(2) ("[CSOSA] shall supervise any offender who is released from imprisonment for any term of supervised release imposed by the Superior Court of the District of Columbia. Such offender shall be subject to the authority of the United States Parole Commission until completion of the term of supervised release . . . [which] shall have and exercise the same authority as is vested in the United States district courts by paragraphs (d) through (i) of § 3583 of title 18, United States Code. . ."); *see also Denson v. United States*, 918 A.2d 1193, 1195 (D.C. 2006) (per curiam)

conditions of probation or supervised release are set by the Superior Court of the District of Columbia or the U.S. Parole Commission, respectively, out-of-state offenders are subject to conditions set by their original sentencing court and, according to the defendant, by CSOSA as the "compact administrator" under the ICAOS. Def.'s Opp'n Mem., 26-27.

The Court need not determine whether the 18 U.S.C. § 3583 standard guides CSOSA when modifying conditions of probation because, even under this standard, when conditions of probation or supervised release implicate fundamental liberty interests, courts have recognized that the 18 U.S.C. § 3583(d) standard must be applied in harmony with the requirements of the constitutional substantive due process standard. As the Second Circuit explained in a 2005 opinion authored by now-Justice Sotomayor:

> If a special condition implicates a fundamental liberty interest, we must carefully examine it to determine whether it is "reasonably related" to the pertinent factors, and "involves no greater deprivation of liberty than is reasonably necessary," 18 U.S.C. § 3583(d), and our application of these criteria must reflect the heightened constitutional concerns. If the liberty interest at stake is fundamental, a deprivation of that liberty is "reasonably necessary" only if the deprivation is narrowly tailored to serve a compelling government interest.

*Myers*, 426 F.3d at 126 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (discussing substantive due process analysis)). The due process protections of the U.S. Constitution must apply equally to federal and state actions that impose supervised release or probation conditions on individuals, whether they are in-state or out-of-state. Accordingly, the Court evaluates whether the No Contact Provision is narrowly tailored to serve a compelling government interest.

---

("Under District of Columbia law, discretionary conditions of supervised release . . . are imposed not by the trial court, but by . . . the U.S. Parole Commission, which has statutory discretion to impose 'any condition ... it considers to be appropriate'" but must also conform to the requirements of 18 U.S.C. § 3583).

The No Contact Provision at issue here implicates the plaintiff's fundamental liberty interest in raising and interacting with his children.[14] *See Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious . . . than property rights." (internal citations and quotations omitted); *Troxel v. Granville,* 530 U.S. 57, 65 (2000) (plurality opinion) ("the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court.") (O'Connor, J.). Thus, the Court must assess whether the deprivation of the plaintiff's liberty interest by imposition of the No Contact Provision is "narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126; *Loy,* 237 F.3d at 256.

At the outset, the Court recognizes that CSOSA has a compelling interest in protecting the public generally and children, in particular, from sex offenders. The agency and its officers are tasked with the onerous responsibility of rehabilitating sex offenders and other criminals, while simultaneously ensuring that these offenders do not harm members of the general public. The plaintiff does not dispute that CSOSA has a compelling interest in imposing special probation conditions on sex offenders, even ones that restrict liberty interests. Rather, as the plaintiff himself states, "[t]he sole question dispositive of [the] substantive due process claim [] is whether the deprivation is narrowly tailored to serve a compelling government interest." Pl.'s Mem. Supp. Prelim. Inj., at 9.

_____

[14] The substantive component of the Due Process Clause has been used to protect a number of fundamental rights and liberty interests, including "the rights to marry, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citations omitted). The Supreme Court has cautioned, however, that the Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Id.* The liberty interest implicated by the plaintiff's substantive due process challenge in this case, however, is well-established. *See Stanley*, 405 U.S. at 651; *Troxel v. Granville*, 530 U.S. at 65 (plurality opinion) (O'Connor, J.).

The defendant argues that the No Contact Provision is narrowly tailored because it was based on "the plaintiff's specific facts." Def.'s Opp'n Mem., at 33. The "specific facts" underlying the decision by the CSOSA officer responsible for imposing the No Contact Provision are as follows: (1) "his conviction for having sex with a minor over whom he had a custodial relationship," *id*.; (2) concern about the plaintiff's previous domestic issues, including that it "appeared that the mother of [plaintiff's] children was unable to protect herself . . . which raises concerns about her ability to safeguard the welfare of her children," Cole Decl., ¶ 21; (3) the CSOSA officer who initially interviewed the plaintiff described him as "extremely manipulative" and someone who "asks too many questions," *id.* at ¶ 17; and (4) sexual offenders have the potential to "crossover" and "may even have sexual contact with underage members of their own family, including their children." Def.'s Opp'n Mem., at 34-35; Cole Decl., ¶¶ 2-4. Even though the plaintiff does not have a history of abusing his children or show any sexual interest in prepubescent children, the defendant asserts that restricting the plaintiff from interacting with minors is "the least restrictive means of ensuring that all children in the District of Columbia, including plaintiff's own children, [are] safe from an unknown threat." Def.'s Opp'n Mem., at 33.

The defendant's justification for restricting the plaintiff from interacting with his children is undercut by evidence in the record currently before the Court. First, with respect to the plaintiff's prior sexual history and offense conduct, treatment providers, including the agency's own medical experts, describe the plaintiff as engaging in sexual liaisons with his "contemporaries," noting "the most salient dynamics immediately preceding the offense seem to have been his level of immaturity, his casual approach to sex and the distress he was experiencing in his relationship at the time." Def.'s Treatment Provider Report, at 5. Indeed, all

of the plaintiff's acts of sexual conduct with minors occurred when he was between the ages of 18 and 23 and the minors involved were fairly close in age and certainly not pre-pubescent. Sixteen years have passed since the plaintiff's offense conduct and there is no allegation that he has engaged in any sexual behavior with minor girls in the intervening years.

Second, the record is bare of any indication that the plaintiff is attracted to any underage children, let alone his own children. Indeed, the defendant's treatment providers state that "[t]here is no evidence to suggest that he has a sexual preference for minors." *Id*. These same providers state that the plaintiff displays a low risk of recidivism. *Id.* Moreover, the plaintiff supplied the Court with an affidavit from another treatment provider who, after examining the plaintiff, states that the plaintiff "presents a low risk for sexual reoffense." Pl.'s Reply, Ex. 2, Daniel Murrie Aff., ¶ 21. The plaintiff's expert could further "find no evidence to suggest that Mr. Goings poses any appreciable risk of sexual harm to his own children," and that there is "no evidence to suggest that Mr. Goings is at all sexually attracted to prepubescent children." *Id.* ¶¶ 9-10, 14. Notwithstanding the plaintiff's involvement in two domestic incidents, one which involved his current fiancée almost four years ago, and the other involving a former girlfriend in 2002, there is no evidence that the plaintiff poses a risk of harm to his children.

Third, the Florida state judge, who sentenced the plaintiff declined to impose sex offender conditions on the plaintiff during probation. Although the ICAOS authorizes CSOSA to impose different conditions on out-of-state offenders than the transferring state, the sentencing judge was most familiar with the facts of the plaintiff's illegal conduct and was also responsible for balancing the risk the plaintiff posed to the general public after a full and fair hearing, at which the victim of the plaintiff's offense testified. The judge concluded that the plaintiff posed insufficient risk to warrant imposition of sex offender conditions. The Court is cognizant that a

CSOSA staff member reached a different opinion than the sentencing court and concluded that the plaintiff "should be considered high-risk." Cole Decl., Ex. 1, Michael Delaney Report; Cole Decl., ¶ 17. This same CSOSA staff member appeared to base this conclusion at least in part on the plaintiff "ask[ing] many questions and attempt[ing] to draw contradictions from this officer's answers." Cole Decl., Ex. 1, Michael Delaney Report. Given the difficulty that plaintiff's counsel encountered obtaining answers from the defendant or even a response to a letter, the Court is not surprised that the plaintiff endeavored to ask many questions about the justification for the special conditions imposed on him. In any event, the conclusion reached by the CSOSA staff member about the plaintiff being "high-risk" stands in stark contrast to the contrary views of the sentencing court and the medical experts used by the defendant and privately retained by the plaintiff.

Finally, the defendant proffers a potential "cross-over" effect as a basis for concluding that the plaintiff is a danger to his children. Cole Decl., ¶¶ 2-4. CSOSA cites this "cross-over" potential notwithstanding the facts that the plaintiff has never abused his children, treatment providers have opined that the plaintiff is not attracted to underage children or family members, and the plaintiff does not have a history of engaging in sexual relationships with women other than his "contemporaries." The CSOSA officer's speculation about a "cross-over" effect does not appear to be a risk that qualified medical experts who have examined the plaintiff seem to share.

Courts have struck down provisions restricting sex offenders from interacting with their own children as unconstitutional because they were not reasonably related or supported by the record in cases involving sexual offenders who had a history of far more egregious behavior than that of the plaintiff. *See, e.g., United States v. Voelker*, 489 F.3d 139, 154 (3d Cir. 2007)

(vacating no contact condition for offender convicted of possessing child pornography and who also exposed his three-year old daughter's buttocks over a webcam and, allegedly jokingly, offered his daughter for sale on the internet, because it was "not clear" that the district court intended for the ban to apply to the defendant's own children); *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006) (modifying no contact provision to allow offender convicted of child pornography to interact with his daughter because there was "no evidence in the record that Mr. Davis has ever sexually abused a child or that he would try to abuse his daughter once released from prison."); *United States v. Myers*, 426 F.3d 117, 127-28 (2d Cir. 2005) (remanding to district court because record did not support no contact provision for offender convicted of coercing 13-year old girl into sending sexually explicit photos, and who admitted to sexually abusing his girlfriend's eight year old niece); *United States v. Loy*, 237 F.3d 251, 270 (3d Cir. 2001) (interpreting no contact provision for man convicted of child pornography as not extending to offender's own children, should he have any, because it was "unlikely that the District Court intended its condition to extend so far [] [g]iven the severe intrusion on [the defendant's] family life that would otherwise result."). Absent additional information supporting the defendant's position that the plaintiff is a danger to his children, there appears to be no basis to support CSOSA's determination that the No Contact Provision is narrowly tailored or even reasonably related to the danger the plaintiff poses to his children. The Court therefore finds that the plaintiff will likely be successful when challenging the constitutionality of the No Contact Provision in so far as it restricts the plaintiff from interacting with his children.

### 3. The Plaintiff is Likely to Succeed on His Claim that the Challenged Conditions Were Imposed in Violation of the Procedural Component of the Due Process Clause

The Court next addresses the likelihood of success of the plaintiff's contention that the

Challenged Conditions were imposed upon him in violation of the procedural component of the Due Process Clause. Specifically, the plaintiff contends that the Challenged Conditions were "unilaterally imposed by the Defendant, and they remain in place subject to Defendant's discretion," and the plaintiff was not "given an opportunity to be heard regarding any purported facts, . . . presented with no evidence and given no reason for CSOSA's decision, . . . was not provided an opportunity to question the scope or appropriateness of the conditions . . . [and CSOSA's decision] was not adequately explained or justified." Compl. ¶¶ 54-55. The record currently before the Court indicates that the plaintiff was not afforded a meaningful opportunity to be heard, and therefore the Court concludes that the plaintiff has demonstrated a likelihood of success on his claim that the Challenged Conditions, with the exception of Special Condition 2 (requiring sex offender treatment), were imposed without affording the plaintiff sufficient process as required by the procedural component of the Due Process Clause.

### a. Procedural Due Process Generally

The procedural component of the Due Process Clause is intended to "impose constraints on governmental decisions which deprive individuals of liberty or property interests." *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976). Three basic elements are required for a procedural due process claim: (1) deprivation by the government; (2) of life, liberty, or property; (3) without due process of law. *Lightfoot v. District of Columbia*, No. 01-1484, 2011 WL 63904, at *5 (D.D.C. Jan. 10, 2011) (citing *Propert v. District of Columbia,* 948 F.2d 1327, 1331 (D.C. Cir.1991)). To assess procedural due process claims, the Court proceeds in two steps: First, the Court assesses whether the plaintiff was deprived a liberty or property interest by the government. *Kentucky Dep't of Corr. v. Thompson.* 490 U.S. 454, 460 (1989). Second, if the plaintiff was deprived of a liberty or property interest, the court examines "whether the procedures attendant upon that

deprivation were constitutionally sufficient." *Id.* The Court addresses each step of the plaintiff's

procedural due process claim *seriatim* below.

### b. The Challenged Conditions Deprive the Plaintiff of Liberty Interests

To maintain a procedural due process claim, the plaintiff must establish that the

government has deprived him of a liberty interest. *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117

(D.C. Cir. 2010) ("Only after finding the deprivation of a protected interest do[es] [the Court]

look to see if the government's procedures comport with due process," quoting *Amer. Mfrs. Mut.*

*Ins. v. Sullivan*, 526 U.S. 40, 59 (1999)); *see Croddy v. FBI,* No. 00-651, 2006 WL 2844261, at

*3 (D.D.C. Sept. 29, 2006). Individuals on probation, however, "do not enjoy 'the absolute

liberty to which every citizen is entitled, but only conditional liberty properly dependent on

observance of special probation restrictions.'" *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)

(quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)); *see also Grayson v. Kansas*, No. 06-

2375, 2007 U.S. Dist. LEXIS 76386, at *17 (D. Kan. Oct. 12, 2007) ("Probationers, however,

enjoy only conditional liberty and its attendant rights, distinct from the absolute liberty afforded

ordinary citizens and the full panoply of rights due those subject to criminal prosecution."). This

is because "[p]robation is a type of contract: the state foregoes a period of incarceration in

consideration for the probationer's agreement to abide by court-imposed conditions that are less

confining than prison." *Pelland v. Rhode Island*, 317 F. Supp. 2d 86, 94 (D.R.I. 2004). The

revocation or modification of probation is not part of a criminal prosecution, and the rights of an

offender are not the same as a criminal defendant. *Morrissey*, 408 U.S. at 481 ("[T]he full

panoply of rights due a defendant" in a criminal prosecution does not apply to parole revocations

because "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is

entitled, but only of the conditional liberty properly dependent on observance of special parole

restrictions."); *Epps v. United States Att'y. Gen.*, 575 F. Supp. 2d 232, 241 (D.D.C. Sept. 8, 2008).  Nevertheless, probationers have a liberty interest in "maintaining [their] conditional freedom." *Epps*, 575 F. Supp. at 241.

The plaintiff asserts that, in addition to the fundamental liberty interest implicated by the No Contact Provision (Special Condition 15), the other Challenged Conditions also infringe upon the plaintiff's liberty interests.  Specifically, the Challenged Conditions impose sex offender treatment and evaluation (Special Condition 2), global positioning system monitoring (Special Condition 7), and prohibit the plaintiff from spending time (Special Condition 16) or working (Special Condition 17) in locations frequented by children.  These restrictions "involve Mr. Goings' basic rights to privacy, freedom of movement, and freedom of association."  Pl.'s Mem. Supp. Mot. Prelim. Inj., at 16.  The Court finds that, notwithstanding the conditional nature of the plaintiff's liberty interest as a result of his status as a probationer, Special Conditions 7, 15, 16 and 17 significantly burden his freedom, and would therefore serve as a basis for a procedural Due Process Clause claim.[15]  Special Condition 2, however, does not.

Special Condition 2 directs the plaintiff to undergo evaluation and complete sex offender therapy, which could include polygraph examinations.  This condition, according to the plaintiff, implicates the plaintiff's privacy rights, particularly "the individual interest in avoiding disclosure of personal matters." Pl.'s Mem. Supp. Mot. Prelim. Inj., at 16 (quoting *Whalen v. Roe,* 429 U.S. 589, 598-99 (1977)).  The plaintiff relies on the Supreme Court's articulation of this privacy interest in *Whalen*, but the D.C. Circuit has "expressed grave doubts as to whether there is a Constitutional right protecting the disclosure of confidential information."  *Croddy*,

---

[15] The defendant contends that the plaintiff does not have a liberty interest with respect to any of the Challenged Conditions because those convicted of sex offenses have no liberty interest in being free from sex offender conditions. Def.'s Opp'n Mem., at 37.  While the Fifth Circuit appears to have adopted this broad theory, *Jennings v. Owens*, 602 F.3d 652, 659 (5th Cir. 2010), the Court finds no support for this proposition in this Circuit.

2006 WL 2844261, at *4 (citing *Am. Fed'n of Gov't Emps. v. HUD*, 118 F.3d 786, 791 (D.C. Cir. 1997). In *American Federation of Government Employees v. HUD*, the D.C. Circuit questioned the scope of the broad privacy right articulated in *Whalen*, and further stated that the "the individual interest in protecting the privacy of the information sought by the government is significantly less important where the information is collected by the government but not disseminated publicly." 118 F.3d at 793 (holding that HUD and Department of Defense questionnaires did not violate employees' privacy rights because of employees' diminished interest in resisting disclosure and measures designed to protect against public disclosure of the information). This is precisely the case here. Although Special Condition 2 requires the plaintiff to undergo sex offender treatment, which may involve demands for him to divulge deeply private information, this information is to be used for the purpose of the plaintiff's treatment and not for public dissemination. Given the D.C. Circuit's strong views regarding the narrow scope of the privacy right articulated by the Supreme Court in *Whalen*, the Court must find that the plaintiff does not have a liberty interest that would support a procedural due process claim for Special Condition 2, and his ultimate challenge of this condition is therefore unlikely to succeed. *See Warner v. McVey*, No. 08-55, 2010 U.S. Dist. LEXIS 83582, at *47 (W.D. Pa. July 9, 2010) (Mag. J. Report and Recommendation) *adopted by Warner v. McVey,* No. 08-55, 2010 U.S. Dist. LEXIS 83507 (W.D. Pa. Aug. 16, 2010) (probationer's liberty interest in being free from sex offender treatment is not "clearly established" and would not appear "unlawful to objectively reasonable official.").

The Court holds, however, that the plaintiff's liberty interests are implicated by the continued enforcement of the remaining Challenged Conditions. Special Conditions 7, 16 and 17 require the plaintiff to wear a GPS monitoring device, and prohibit him from working or

spending time in locations frequented by children. These conditions deprive the plaintiff of his freedom of movement and association. *See City of Chicago v. Morales,* 527 U.S. 41, 53 (1999) ("the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause . . ."); *United States v. Baird,* 276 Fed. Appx. 691, 692 (9th Cir. 2008) (vacating GPS monitoring condition imposed on defendant convicted of child pornography because record insufficient to determine if condition was reasonably related to goals of supervised release). As elaborated above, Special Condition 15 restricts the plaintiff from interacting with his children, and this implicates a fundamental liberty interest. *See Troxel v. Granville,* 530 U.S. 57, 65 (2000) (plurality opinion) (O'Connor, J.) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."). Thus, the Court holds that CSOSA's continued enforcement of Special Conditions 7, 15, 16, and 17 deprives the plaintiff of liberty interests, and the Court must therefore inquire whether the process afforded to the plaintiff prior to the imposition of these conditions was constitutionally sufficient.

### c. The Procedures Afforded to the Plaintiff to Contest the Challenged Conditions and the Modification of His Probation

Prior to assessing the sufficiency of the procedures afforded to the plaintiff, the Court notes that, given developments since the plaintiff originally filed his Complaint, the plaintiff's procedural due process challenge has bifurcated into two related but distinct challenges: (1) a challenge to the sufficiency of the process when CSOSA initially imposed the special conditions on October 20, 2010; and (2) a challenge to the sufficiency of the process during and after the initial risk assessment. The defendant contends that when the Challenged Conditions were initially imposed, on October 20, 2010, CSOSA had a compelling governmental interest in immediately placing restrictions on the plaintiff's probation until completion of the initial risk

assessment because CSOSA had little information about the plaintiff and, consequently, could not unconditionally release him into the public. The defendant further contends that the continued imposition of the Challenged Conditions, even post-risk assessment, is constitutional because CSOSA provided the plaintiff with a meaningful opportunity to be heard during his initial risk assessment.

The Due Process Clause requires "the opportunity to be heard at a meaningful time and in a meaningful manner" when an individual is deprived of liberty or property interests. *Mathews,* 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). This requires, "at minimum, that the government provide notice and some kind of hearing." *Propert*, 948 F.2d at 1331 (discussing deprivation of property interests); *see also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433 (1982) ("[I]t has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest.") (citation omitted) (emphasis in original); *Gray Panthers v. Schweiker,* 652 F.2d 146, 165 (D.C. Cir. 1980) (the "core requirements" of due process require "adequate notice" and "a genuine opportunity to explain."). This requirement, however, is not "a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews,* 424 U.S. at 334 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (citation omitted). "The precise form of notice and the precise kind of hearing required depends upon a balancing of the competing public and private interests involved." *Propert,* 948 F.2d at 1332. Balancing of these interests requires the Court to evaluate the three factors identified by the Supreme Court in *Mathews v. Eldridge*: "(1) the significance of the private party's protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and the probable value, if any, of

additional or substitute procedural safeguards." *Gen. Elec. Co.,* 610 F.3d at 117; *Mathews,* 424 U.S. at 335.

The defendant contends that during the initial risk assessment the plaintiff had "many meetings with CSOSA and treatment providers" and, "through counsel, had the opportunity to request that the conditions not be imposed and to provide any information they deemed appropriate." Def.'s Opp'n Mem., at 40. This, according to CSOSA, provided the plaintiff with "a meaningful opportunity to be heard at a meaningful time" and serves as the basis for the continued imposition of the challenged conditions. *Id.* The Court notes, however, that CSOSA does not dispute that it did not provide the plaintiff with (1) notice of the basis for the agency's determination that special conditions of the type imposed were necessary in modification of the court-ordered original conditions, or (2) a hearing before an impartial judicial officer regarding the modification of his conditions. Rather, CSOSA contends that meetings with his treatment providers provided the plaintiff with a sufficient opportunity to be heard. To evaluate this contention, the Court balances the *Mathews* factors and assesses the sufficiency of the procedures afforded to the plaintiff.

The first *Mathews* factor requires the Court to evaluate the significance of the plaintiff's protected interest. As explained above, the No Contact Provision, and Special Conditions 7 (GPS monitoring), 16 (loitering in places frequented by children) and 17 (working in places frequented by children) implicate the plaintiff's liberty interests. They proscribe him from visiting his family, attending public functions, and have required him to shift residences on at least two occasions. Compl., ¶¶ 20-22, 43. These interests are significant.

The second *Mathews* factor evaluates the government's interest. There is no question, as the plaintiff acknowledges, that maintaining public safety and rehabilitating convicted sex

offenders is an important government interest.  Pl.'s Reply Mem., at 20.  On the other hand,

CSOSA does not articulate any government interest in denying the plaintiff notice and a hearing

before modifying a specific court-ordered condition of probation. Plaintiff's meetings with

CSOSA officers and treatment providers do not provide sufficient opportunity to challenge the

modification of his probation conditions.[16] Apparently, even with these meetings, the plaintiff

was given no explanation for imposition of the Challenged Conditions nor justification for a

significant modification of the probation terms set by the sentencing court. Moreover, the

defendant's contention that the plaintiff could provide input "through counsel" is misleading

considering that CSOSA did not reply to plaintiff's counsel's letter or otherwise engage the

plaintiff until he filed the instant lawsuit.  The government's interest in imposing conditions

without a meaningful opportunity to be heard may be strong when sex offenders are first

transferred into the District through the Interstate Compact, but there appears to be no

government interest in denying the plaintiff a meaningful opportunity to be heard either during

the initial risk assessment or after it has concluded.

 The third *Mathews* factor instructs the Court to evaluate the risk of erroneous deprivation

and the probable value, if any, of additional or substitute procedural safeguards.  Having found

that the plaintiff has a likelihood of success on his claim that the No Contact Provision was

imposed in violation of the plaintiff's substantive due process rights, the Court must conclude

that the risk of erroneous deprivation of the plaintiff's rights is great and the probable value of

additional procedures is high.  The primary question for the Court, however, is what procedures

CSOSA should implement in order to provide the plaintiff sufficient process.  The defendant

provides one solution, which is to require CSOSA to hold a "post-risk assessment hearing."

---

[16] The Court notes that questioning by the plaintiff of CSOSA staff can, in fact, have adverse consequences for him since CSOSA may view a person who "asks too many questions" as "extremely manipulative. Cole Decl., ¶ 17.

Def.'s Opp'n Mem., at 40. This solution may be acceptable, particularly if it conforms with the procedures outlined by the Federal Rules of Criminal Procedure, which requires a hearing, an opportunity for the offender to make a statement and present evidence, and the right to counsel before modification of probation or supervised release conditions. FED. R. CRIM. P. 32.1(c)(1).[17]

Regardless of the exact procedures CSOSA could institute, based on the current record, the plaintiff has demonstrated a likelihood of success on his procedural due process claim. The defendant did not provide the plaintiff a "meaningful opportunity to be heard" before, during or after the initial risk assessment. Coupled with the fact that the defendant has not articulated its interests in denying the plaintiff additional process, and that the risk of erroneous deprivation of the plaintiff's rights as well as the probable value of additional procedures is high, the Court finds that the plaintiff has a likelihood of success when challenging the constitutionality of the continued enforcement of Special Conditions 7, 15, 16, and 17.

### E. Plaintiff's Irreparable Harm

To warrant injunctive relief, the plaintiff must not only establish a likelihood of success on the merits, but also demonstrate irreparable harm absent immediate judicial intervention. The plaintiff alleges that the continued enforcement of the Challenged Conditions deprives the plaintiff of his constitutional rights, an injury which has been ongoing since the conditions were first imposed in October 2010. Given that the conditions imposed on the plaintiff limit his ability to see and interact with his family, his freedom of movement, and association, the Court finds that the plaintiff has demonstrated irreparable harm.

---

[17] Other courts have proposed alternatives in dicta. *See, e.g., Interstate Comm'n for Adult Offender Supervision v. Tennessee Bd. of Prob. and Parole*, No. 04-526, slip op. at 9 (E.D. Ky. Apr. 1, 2005) (commenting that requiring an offender to agree to a psychiatric evaluation in receiving state prior to transfer as part of application process would provide notice).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). The injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). This standard requires the party moving for injunctive relief to demonstrate that "[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citations omitted). In addition, "the injury must be beyond remediation." *Id.* "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)); *see also* 11A Wright & Miller, Fed. Prac. & Proc. § 2948.1 (2d ed. 2004) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

As explained above, the No Contact Provision infringes on the plaintiff's constitutionally protected right to maintain a relationship with his children. This injury is not only certain, but ongoing considering that CSOSA has yet to allow the plaintiff any form of physical contact with his children. In addition, the plaintiff has further demonstrated that he suffers irreparable injury because of the imposition of the Special Condition 7, which imposes GPS monitoring of the plaintiff and restricts his movement, and Special Conditions 16 and 17, which specifically ban him from associating with minors, going near certain areas, such as public libraries, and engaging in certain activities. These conditions restrict the plaintiff's freedom of movement and association, and therefore constitute irreparable harm. Special Condition 2, which orders the plaintiff to undergo sex offender therapy, does not appear, however, to implicate a privacy or

constitutionally protected interest. The Court is therefore unwilling to find that the imposition of that condition constitutes irreparable harm.

### F. Balancing of the Equities and the Public Interest

Before granting a preliminary injunction, the Court must balance the plaintiff's likelihood of success and demonstration of irreparable harm against the potential harm to the defendant and the public interest. Regarding the plaintiff's substantive due process challenge to the No Contact Provision, CSOSA would not be harmed from an injunction enjoining enforcement of the No Contact Provision so that the plaintiff would be permitted to interact with his children. As explained, there is no evidence to suggest that the plaintiff poses any risk of harm to his children, and the public interest would not be furthered by isolating the plaintiff from his family. The plaintiff has shown a likelihood of success on the merits of this claim, he is suffering irreparable injury absent an injunction, and the balance of the equities and the public interest weighs in his favor. Accordingly, the Court therefore grants the plaintiff's motion and enjoins enforcement of the No Contact Provision in so far as it applies to the plaintiff's children.

The plaintiff's request for a preliminary injunction in connection with his procedural due process claim, however, is more complicated. On the current record, the defendant has shown a likelihood of success on his claim that CSOSA has failed to provide him a meaningful opportunity to be heard in regards to the imposition of Special Conditions 7, 15, 16, and 17; and the plaintiff is suffering irreparable harm due to the continued enforcement of these provisions. The Court, however, must nonetheless deny the plaintiff's request to enjoin enforcement of these conditions pending a full hearing on the merits.

The defendant argues that granting a preliminary injunction would cause CSOSA significant harm because an effect of the Court's ruling would be to compromise the operations of the ICAOS, and would also deprive CSOSA its authority to impose conditions on out-of-state

offenders.  Although the plaintiff insists that he only challenges the constitutionality of six special conditions imposed on his probation, the Court believes that the plaintiff's procedural due process challenge is more complicated than the plaintiff acknowledges.

Primarily weighing against granting the plaintiff's request for an injunction on his procedural due process claim is the fact that the current record does not provide the Court with any information regarding the potential ramifications of a Court ruling in the plaintiff's favor on this claim. The parties have provided no information as to whether, as a standard practice, CSOSA modifies court-ordered probation conditions for sex offenders transferred into the District without affording these offenders a hearing or another form of process.  The Court further has no information whether probation authorities across the country similarly do not afford transferred offenders a hearing or other opportunities to be heard prior to modifying court-ordered probation conditions.  A ruling in the plaintiff's favor may render invalid conditions placed unilaterally by CSOSA on offenders transferred into the District of Columbia and cast doubt on non-judicial modifications of probation conditions placed upon offenders transferred under ICAOS across the country.  Given the current incomplete record before the Court and the lack of any constructive input from the parties about the scope or impact of a potential ruling in favor of plaintiff's procedural due process challenge, the Court declines to grant injunctive relief on this part of plaintiff's motion.

Further, CSOSA is tasked with managing the probation and supervised release of all out-of-state offenders transferred into the District pursuant to the ICAOS.  As the "compact administrator or supervising authority," CSOSA exercises authority unilaterally to impose and modify not only the plaintiff's probation conditions, but probation conditions for all out-of-state offenders transferred pursuant to the ICAOS.  *See* ICAOS Rules, Rule 4.103.  This provision of

the ICAOS, if it indeed authorizes CSOSA to take such action, raises several significant constitutional and statutory issues, none of which have been briefed or addressed by the parties and are therefore not appropriate to resolve on the current record:

First, whether the ICAOS authorizes CSOSA to modify unilaterally a court order setting forth specific conditions of probation (or none at all) and, if so, whether this authority constitutes an improper delegation of judicial authority, in violation of the separation of powers. *See United States v. Pruden*, 398 F.3d 241, 250 (3d Cir. 2005) ("The most important limitation is that a probation officer may not decide the nature or extent of the punishment imposed upon a probationer."); *United States v. Scott,* 316 F.3d 733, 736 (7th Cir. 2003) (supervised release terms should be precise, because broad delegations to probation officers "create opportunities for arbitrary action"); *see also United States v. Lomas,* 304 Fed. Appx. 300, 300 (5th Cir. 2008) (finding "impermissible delegation of judicial authority" where the probation officer was given the authority to decide whether a defendant will participate in a treatment program); *United States v. Peterson*, 248 F.3d 79, 84-85 (2d Cir. 2001) (same); *cf. Smallwood v. United States Parole Comm'n,* No. 09-2024, 2011 WL 1441907, at *1-2 (D.D.C. Apr. 15, 2011) (U.S. Parole Commission, which is given statutory authority "similar [] with respect to terms of supervised release imposed by" the D.C. Superior Court, "exercises no judicial function . . .").

Second, whether CSOSA as a general practice unilaterally modifies probation conditions for out-of-state offenders without affording these offenders a "meaningful opportunity to be heard," and, if so, whether this practice raises an equal protection claim since out-of-state offenders are not afforded the same procedural safeguards as in-state probationers. *See Doe v. Pennsylvania Bd. of Prob. and Parole*, 513 F.3d 95, 107-08 (3d Cir. 2008) (holding that the Equal Protection Clause was violated when an out-of-state offender was not provided a hearing

to contest sex offender registration under Megan's Law when such a hearing was required for in-state offenders); *Doe v. Ward,* 124 F. Supp. 2d 900, 916 (W.D. Pa. 2000) ("Without ruling on the constitutional issues, we hold, based on a plain reading of the Parole Compact, that . . . Doe must be provided with the same process as is provided to in-state sex offenders before subjected him to community notification.").

Third, whether CSOSA complies with the terms of the ICAOS requiring out-of-state offenders to be treated in a manner "consistent with the supervision of other similar offenders sentenced in the [District of Columbia]," ICAOS Rules, Rule 4.101, because CSOSA does not provide out-of-state offenders procedures similar to those afforded to District of Columbia offenders upon modification of probation conditions. Under District of Columbia law, probation conditions for District of Columbia offenders are imposed and modified by D.C. Superior Court, by an impartial judicial officer, and CSOSA only has authority to supervise those conditions. *See* D.C. CODE § 24-133(c)(3) ("The Agency shall carry out the conditions of release imposed by the Superior Court . . .").

Fourth, whether requiring CSOSA to provide out-of-state offenders additional procedural safeguards before modifying their probation conditions would necessitate transfer of the offender's entire case to the receiving state. The Interstate Commission for Adult Offender Supervision is currently considering a proposed rule that would facilitate the complete transfer of an offender's case in order to "empower supervising authorities with full legal jurisdiction to enforce orders and conditions of supervision and respond swiftly to probationer violative behavior, increasing offender accountability." *See* Memorandum from the ICAOS Rules Committee on 2011 Proposals to Create/Amend ICAOS Rules to ICAOS Commissioners & Compact Administrators, at *8-9 (Mar. 1, 2011), *available at* http://www.interstatecompact.org/

LinkClick.aspx?fileticket=QCNB_QNGR2g=&tabid=286&mid=810 (discussing proposed Rule 3.101-4). The Commission stated, however, "that [it] lacks the authority to promulgate this rule because it exceeds the scope of the authority granted to the Commission by the member state legislatures under the compact statute and by Congress under the federal consent statute" and the rule also presented "potential constitutional and due process and equal protection issues." *Id.* at *8-9.

These outstanding constitutional questions further complicate the plaintiff's procedural due process challenge. The public harm that may inadvertently result from a ruling casting doubt on the District of Columbia's handling of transferred sex offenders pursuant to the ICAOS weighs determinatively against granting the plaintiff's motion for injunctive relief on his procedural due process claim, prior to full and complete consideration of the merits. For this reason, given the outstanding issues regarding the plaintiff's procedural due process claim, as well as the potential implication of a ruling on the matter, the Court deems it inappropriate to grant the plaintiff a preliminary injunction and denies the plaintiff's request to enjoin CSOSA from enforcing Special Conditions 2, 7, 16 and 17. The parties are directed to comply with paragraph five of the Court's Standing Order, ECF No. 3, and submit a joint Meet and Confer Report within 30 days of the filing of this Memorandum Opinion, which shall include a proposed discovery, briefing and hearing schedule on the procedural due process and other constitutional and statutory issues raised by the plaintiff's complaint.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiff's motion for a preliminary injunction is granted in part, and denied in part. The Court denies plaintiff's request to issue a preliminary injunction enjoining enforcement of Special Conditions 2, 7, 16 and 17, but grants an injunction enjoining

CSOSA from enforcing Special Condition 15 so as to restrict the plaintiff from interacting with his children.  An Order consistent with this Memorandum Opinion will be entered.

**DATED:  MAY 3, 2011**

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge